UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHIERKATZ RLLP,<br><br>        Plaintiff,<br><br>    v.<br><br>SQUARE, INC.,<br><br>        Defendant. | Case No. 15-cv-02202-JST<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION**<br><br>Re: ECF No. 28 |

Before the Court is Defendant's Motion to Dismiss First Amended Complaint or in the Alternative to Stay and to Compel Arbitration. ECF No. 28. For the reasons set forth below, the motion to compel arbitration is granted.

I.  **BACKGROUND**

    A.  **Factual and Procedural Background**

Plaintiff shierkatz RLLP ("Shierkatz"), a bankruptcy law firm, is a California limited liability partnership. ECF No. 55 ¶ 1. Defendant Square, Inc. ("Square") is a Delaware corporation with its principal place of business in San Francisco, CA. Id. ¶ 2. Square provides a service "allow[ing] customers who sign up for accounts to accept [credit] card payments through their Apple and Android mobile devices, including smartphones." ECF No. 28 at 6. This service allows customers "to accept electronic payments without themselves directly opening up a merchant account with any Visa or MasterCard member bank." ECF No. 55 ¶ 5.

Shierkatz alleges that on July 14, 2013, it opened an account with Square "through the then-existing version of the Square Website." Id. ¶ 6. The parties do not contest that Shierkatz agreed to the terms of Square's Seller Agreement, which was in effect at that time. On April 16, 2015, Square sent Shierkatz an email, stating "your account was deactivated because we reviewed your account and found that your business is prohibited by Section 6 of the Square Seller

1  Agreement, which means we cannot accept payments related to your business." Id. ¶ 7, Exhibit 1.
2  Section 6 of Square's Seller Agreement provided: "By creating a Square Account, you . . . confirm
3  that you will not accept payments in connection with the following businesses or business
4  activities: . . . (29) bankruptcy attorneys or collection agencies engaged in the collection of debt."
5  Id. ¶ 8. Square's April 16, 2015 email further informed Shierkatz that Square's "decision to
6  deactivate your account is final. Due to the obligations of our agreements with card networks and
7  other financial institutions, we cannot reverse this decision and are unable to provide additional
8  details." Id. ¶ 7, Exhibit 1.
9        On May 15, 2015, Shierkatz filed a Class Action Complaint, alleging violations of
10  California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51–52, and California's
11  Unfair Competition Law. ECF No. 1. Shierkatz's Unruh Act claim was premised on Square's
12  alleged intention to continue "discriminating against [Shierkatz] following [Square's] termination
13  of [Shierkatz]'s Credit Card Account by way of [Square's] refusing to ever again allow [Shierkatz]
14  to open another Credit Card Account due to [Shierkatz]'s status as a 'business [that] is prohibited
15  by Section 6[a] of [Square's] Seller Agreement.'" Id. ¶ 13. After Square filed a motion to dismiss
16  Shierkatz's Class Action Complaint, ECF No. 14, Shierkatz subsequently filed a First Amended
17  Class Action Complaint ("FAC"), dropping its unfair competition claim. ECF No. 22. Square
18  then filed a motion to dismiss the FAC, ECF No. 28, which motion was fully briefed on
19  September 10, 2015. ECF No. 40.
20        On September 16, 2015, before considering the merits of Square's motion to dismiss, the
21  Court ordered Shierkatz to show cause why this case should not be dismissed for lack of subject
22  matter jurisdiction. ECF No. 46. The Court's Order to Show cause noted that the FAC alleged
23  subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), which requires at least one member of
24  the putative plaintiff class be "a citizen of a State different from any defendant." Id. at 1. The
25  FAC, however, did not allege that at least one member of the putative class was a citizen of a state
26  other than California and Delaware, the states of Square's citizenship for diversity purposes. Id.
27  After the parties responded to the Order to Show Cause, the Court granted leave for Shierkatz to
28  amend the FAC "for the sole purpose of adequately alleging minimal diversity." ECF No. 53 at

1–2.

On October 1, 2015, Shierkatz filed a Second Amended Complaint ("SAC").  ECF No. 55.  After the Court assured itself that the SAC remedied the subject matter jurisdiction defect noted in the Order to Show Cause, the Court vacated the Order to Show Cause, ECF No. 62, and informed the parties that it would treat Square's previously-filed motion to dismiss, ECF No. 28, and the subsequent briefing, as having been filed with respect to Shierkatz's SAC.  ECF No. 56.

The SAC's sole claim for relief is for violation of California's Unruh Act.  According to Shierkatz, Square's sending Shierkatz and putative class members[1] a "Final Deactivation Notice," such as the email excerpted *supra*, "constituted Post-Termination Unruh Law Violations."  ECF No. 55 ¶ 40. The claim raised in the SAC only concerns "post-termination" Unruh Act violations.  ECF No. 36 at 2.  "It is in no way concerned with [Square's] initial termination of [Square's] relationship with [Shierkatz]."  Id.

### B. The Square Seller Agreement

The Square Seller Agreement,[2] which the parties do not contest Shierkatz agreed to when it signed up for Square's services on July 14, 2013, included the following arbitration provision:

> 51. Binding Individual Arbitration
>
> You and Square agree to arbitrate all Disputes. Arbitration is more informal than a lawsuit in court and seeks to resolve disputes more quickly. Instead of a judge or a jury, the case will be decided by a neutral arbitrator who has the power to award the same damages and relief that a court can. ANY ARBITRATION UNDER THIS AGREEMENT WILL BE ONLY BE [sic] ON A [sic] INDIVIDUAL BASIS; CLASS ARBITRATIONS, CLASS ACTIONS, PRIVATE ATTORNEY GENERAL ACTIONS, AND CONSOLIDATION WITH OTHER ARBITRATIONS ARE NOT PERMITTED, AND YOU ARE WAIVING YOUR RIGHTS TO HAVE YOUR CASE DECIDED BY A JURY AND TO PARTICIPATE IN A CLASS ACTION AGAINST SQUARE. If any provision of this arbitration agreement is found unenforceable,

---

[1] The SAC defines the putative class as "all Persons to whom [Square] has ever sent a Final Deactivation Notice constituting Post-Termination Unruh Law Violations despite the fact such a Person was not accepting payments in connection with any business/business activity involving illegal activity or illegal goods."  ECF No. 55 ¶ 30.
[2] The Court takes judicial notice of the Square Seller Agreement, ECF No. 15-2, as a "document whose contents are alleged in a complaint and whose authenticity no party questions, but which [is] not physically attached to the [plaintiff's] pleading."  Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (internal quotation marks omitted).

3

> the unenforceable provision shall be severed, and the remaining arbitration terms shall be enforced (but in no case shall there be a class arbitration). All Disputes shall be resolved finally and exclusively by binding individual arbitration with a single arbitrator administered by the American Arbitration Association (www.adr.org) or JAMS (www.jamsadr.org) according to this provision and the applicable arbitration rules for that forum. Consumer claimants (individuals whose transaction is intended for personal, family, or household use) may elect to pursue their claims in their local small-claims court rather than through arbitration. The Federal Arbitration Act, 9 U.S.C. §§ 1-16, fully applies. . . . The arbitrator's award shall be binding on the parties and may be entered as a judgment in any court of competent jurisdiction. For any Dispute, Square will pay all the arbitration fees. If you prevail on any claim for which you are legally entitled to attorney's fees, you may recover those fees from the arbitrator. For any claim where you are seeking relief, Square will not seek to have you pay its attorney's fees, even if fees might otherwise be awarded, unless the arbitrator determines that your claim was frivolous. . . .

ECF No. 15-2, § 51 (the "Arbitration Provision").

Section 52 of the Square Seller Agreement provided: "This Agreement and any Dispute will be governed by California law and/or applicable federal law (including the Federal Arbitration Act) as applied to agreements entered into and to be performed entirely within California, without regard to its choice of law or conflicts of law principles that would require application of law of a different jurisdiction."  Section 59, in turn, defined "Dispute" to mean:

> any claim, controversy, or dispute (whether involving contract, tort, equitable, statutory, or any other legal theory) between you and Square including but not limited to any claims relating in any way to this Agreement (including its breach, termination, or interpretation), any other aspect of our relationship, Square advertising, and any use of Square software or services.  "Dispute" also includes any claims that arose before this Agreement and that may arise after termination of this Agreement.[3]

Finally, Section 54 of the Agreement, entitled "Right to Amend," stated:

> We have the right to change or add to the terms of this Agreement at any time, and to change, delete, discontinue, or impose conditions on any feature or aspect of the Services with notice that we in our sole discretion deem to be reasonable in the circumstances, including such notice on our website at squareup.com or any other website maintained or owned by us for the purposes of providing services in terms of this Agreement. Any use of the Services after our publication of any such changes shall constitute your acceptance

---

[3] Section 40 of the Square Seller Agreement further provided: "If your Square Account is terminated or suspended for any reason or no reason, you agree: (a) to continue to be bound by this Agreement . . . ."

of this Agreement as modified. However, any Dispute that arose before the modification shall be governed by the Agreement (including the binding individual arbitration clause) that was in place when the Dispute arose.

### C. Jurisdiction

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). Minimal diversity exists here because Defendant, a Delaware corporation with its principal place of business in San Francisco, CA, is a citizen of Delaware and California for diversity purposes and at least one class member is alleged to be a citizen of a state other than Delaware and California. ECF No. 55 ¶ 30. Additionally, Shierkatz alleges that "there are tens of thousands of Class members." Id. ¶32. Because the minimum statutory damage award under the Unruh Act is $4,000, Cal. Civ. Code § 52, Shierkatz has pleaded that the amount in controversy exceeds $5,000,000, as required by 28 U.S.C. 1332(d)(2).

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") applies to arbitration agreements in any contract affecting interstate commerce. See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119 (2001); 9 U.S.C. § 2. Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." AT&T Mobility LLC v. Concepcion, 131 S.Ct. 1740, 1745 (2011) (internal citations omitted). An arbitration clause may be revoked by "generally applicable contract defenses, such as fraud, duress, or unconscionability." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 68 (2010) (internal quotation marks omitted).

A party bound by an arbitration clause may bring a petition in the district court to compel arbitration. 9 U.S.C. § 4. On a motion to compel arbitration, the court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000). If the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4;

Lifescan, Inc. v. Premier Diabetic Services, Inc., 363 F.3d 1010, 1012 (9th Cir. 2004) ("If the answer is yes to both questions, the court must enforce the agreement."). [4]

When deciding whether a valid arbitration agreement exists, federal courts "apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp. Alabama v. Randolph, 531 U.S. 79, 91 (2000).

## III.   DISCUSSION

### A. Arbitrability

The first question the Court must resolve is who decides the question of arbitrability—this Court or an arbitrator? The answer to this question depends on the language of the parties' agreement.

"[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." Rent-A-Center, 561 U.S. at 68–69. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to

---

[4] Plaintiff argues that it has a "mandatory, statutory right to jury trial respecting the arbitrability of the Post-Termination Unruh Law violations" under section 4 of the FAA. 9 U.S.C § 4. ECF No. 36 at 27. Section 4 of the FAA provides, in part: "If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."
  To trigger the right to a jury trial under Section 4, the party seeking a trial must deny that it entered into an arbitration agreement in the first place. Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 55 (3d Cir. 1980). The question is whether "an agreement to arbitrate was actually reached." Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 771 (3d Cir. 2013). A party which admits it entered into an arbitration agreement, but contests its legal effect or validity, is not entitled to a trial under Section 4. Am. Heritage Life Ins. Co. v. Orr, 294 F.3d 702, 710 (5th Cir. 2002).
  Here, "the making of the arbitration agreement" is not in issue. The parties do not contest that Plaintiff agreed to the Square Seller Agreement, which included an explicit Arbitration Provision. The only issue raised by Plaintiff is whether the Delegation Provision should not be enforced because it is unconscionable. This determination must be made by the Court, not by a jury. Howard v. Ferrellgas Partners, L.P., 748 F.3d 975, 977 (10th Cir. 2014) ("Once the facts are clear, courts must then apply state contract formation principles and decide whether or not the parties agreed to arbitrate."); 9 U.S.C. § 4 (If the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.").

decide arbitrability' turns upon what the parties agreed about *that* matter." First Options of Chicago, 514 U.S. at 943 (emphasis in original) (internal citations omitted). Whether the court or an arbitrator decides arbitrability is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (quoting AT&T Techs., Inc. v. Commc'ns Workers of America, 475 U.S. 643, 649 (1986)). While courts generally resolve ambiguities in arbitration agreements in favor of arbitration, ambiguities as to the delegation of arbitrability are resolved in favor of court adjudication. See First Options, 514 U.S. at 94–95. For arbitration agreements under the FAA,[5] "the court is to make the arbitrability determination by applying the federal substantive law of arbitrability absent clear and unmistakable evidence that the parties agreed to apply non-federal arbitrability law." Brennan v. Opus Bank, 796 F.3d 1125, 1129 (9th Cir. 2015) (internal citations and quotation marks omitted).

As a preliminary matter, the Court finds that it must apply federal arbitrability law because the Square Seller Agreement's choice-of-law provision (ECF No 15-2, § 52) does not *expressly* state that California law governs the question of arbitrability. See id.; see also Cape Flattery Ltd. v. Titan Maritime, LLC, 647 F.3d 914, 921 ("[C]ourts should apply federal arbitrability law absent 'clear and unmistakable evidence' that the parties agreed to apply non-federal arbitrability law."). Section 52 of the Square Seller Agreement, entitled "Governing Law," provides: "This Agreement and any Dispute will be governed by California law and/or applicable federal law (including the Federal Arbitration Act) . . . ." ECF No. 15-2, § 52. Because this does not constitute "clear and unmistakable evidence that the parties agreed to apply non-federal arbitrability law," the Court must apply federal arbitrability law. Brennan, 796 F.3d at 1129.

Applying federal arbitrability law, the Court must next determine whether the parties "clearly and unmistakably" delegated the "gateway" issue of arbitrability to an arbitrator. Id. at 1130 (emphasis omitted). That is, the Court must decide whether the parties "clearly and

---

[5] Plaintiff does not dispute that the Square Seller Agreement is governed by the FAA because "the FAA applies to any contract, like the present one, 'evidencing a transaction involving commerce.' 9 U.S.C. § 2." Brennan v. Opus Bank, 796 F.3d 1125, 1129 (9th Cir. 2015).

7

unmistakably" agreed that the arbitrator, and not the Court, should determine arbitrability in the first instance.  Id.

Square argues that the evidence shows a "clear and unmistakable" agreement to delegate all questions of arbitrability to the arbitrator.  ECF No. 40 at 4.  The relevant portion of the Arbitration Provision provides:

> You and Square agree to arbitrate all Disputes. . . . All Disputes shall be resolved finally and exclusively by binding individual arbitration with a single arbitrator administered by the American Arbitration Association (www.adr.org) or JAMS (www.jamsadr.org) according to this provision and the applicable arbitration rules for that forum.

ECF No. 15-2, § 51.  According to Square, (1) the Arbitration Provision includes a Delegation Provision, which "offers claimants the choice of initiating arbitration with either of the two leading organizations, the American Arbitration Association ('AAA') or JAMS, Inc. ('JAMS')," (2) the Delegation Provision further provides that the rules of the chosen arbitration organization will apply, and (3) "both organizations' commercial arbitration rules authorize the arbitrator to determine arbitrability."  ECF No. 40 at 7.

The Court agrees with Square's argument in this respect.  Under Brennan, "the incorporation of the AAA rules [which provide that 'the arbitrator shall have the power to rule on his or her own jurisdiction'] constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability," at least where the contracting parties are "sophisticated."  796 F.3d at 1130.  As in Brennan, it is undisputed that Shierkatz, a bankruptcy law firm, is a "sophisticated party."  The only relevant distinction between this case and Brennan is that the Delegation Provision here requires arbitration administered by either AAA or JAMS, whereas the delegation provision in Brennan required arbitration administered by AAA.  While Shierkatz makes much of this difference, the Court does not see how this distinction could possibly affect its decision.  Indeed, as Shierkatz previously admitted, ECF No. 31 at 1–2, and does not dispute here, both the AAA rules and JAMS rules provide that the arbitrator shall decide issues of arbitrability.[6]

---

[6] See AAA, Commercial Arbitration Rules and Mediation Procedures, Rule 7(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim

8

Because the Arbitration Provision provides that "[a]ll Disputes shall be resolved finally and exclusively by binding individual arbitration . . . administered by [the AAA or JAMS] according to this provision and the applicable arbitration rules for that forum," and both the applicable AAA and JAMS rules provide that the arbitrator shall decide arbitrability, the Court concludes that the incorporation of the AAA or JAMS rules "constitutes clear and unmistakable evidence that [the] parties agreed to arbitrate arbitrability." Brennan, 796 F.3d at 1130; see also Howard v. Rent-A-Center, Inc., No. 10-cv-0103, 2010 WL 3009515, at *4 (E.D. Tenn. July 28, 2010) ("[T]he Court concludes the parties in this case clearly and unmistakable delegated arbitrability by referencing the rules of the AAA, JAMS, and NAF in their agreement.")

### B. Unconscionability of the Delegation Provision

Because the Court has concluded that the parties clearly and unmistakably delegated the question of arbitrability to the arbitrator, "the only remaining question is whether the particular agreement *to delegate* arbitrability—the Delegation Provision—is itself unconscionable." Brennan, 796 F.3d at 1132 (emphasis in original); see also Rent-A-Center, 561 U.S. at 71–72 (requiring that the unconscionability claim be specific to the delegation clause). Under Brennan, the Court may decline to enforce the Delegation Provision if the clause itself is unconscionable or otherwise unenforceable. Brennan, 796 F.3d at 1132.

Here, Shierkatz raises several unconscionability arguments directed both at the Arbitration Provision as a whole and at the Delegation Provision specifically. See, e.g., ECF No. 36 at 11 ("Square's Class Action Waivers, the Square Delegation Provisions, and Square's Arbitration Agreement are procedurally unconscionable whether all are read together or each is considered separately."). Thus, unlike in Brennan, the Court must address the merits of Shierkatz's unconscionability arguments as they relate to the Delegation Provision specifically. In doing so, the parties do not dispute that California contract law applies.

---

or counterclaim."); JAMS, Comprehensive Arbitration Rules and Procedures, Rule 11(b) ("Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.").

9

Under California law, "the core concern of unconscionability doctrine is the absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Sonic–Calabasas A, Inc. v. Moreno, 57 Cal. 4th 1109, 1145 (2013). "As the party opposing arbitration," Shierkatz "'bears the burden of proving . . . unconscionability.'" Id. (quoting Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC, 55 Cal. 4th 223, 236 (2012)). An agreement may be found to be "invalid if it is *both* procedurally and substantively unconscionable." Sanchez v. Carmax Auto Superstores California LLC, 224 Cal. App. 4th 398, 402 (2014) (emphasis added). "Procedural unconscionability focuses on oppression and surprise due to unequal bargaining power, and substantive unconscionability turns on overly harsh or one-sided results." Id. California courts apply a "sliding scale" to determine whether to invalidate an agreement that is both procedurally and substantively unconscionable: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." Armendariz v. Foundation Health Pyschare Services, Inc., 24 Cal. 4th. 83, 114 (2000). "Because unconscionability is a contract defense, the party asserting the defense bears the burden of proof." Sanchez v. Valencia Holding Co., LLC, 61 Cal. 4th 899, 911 (2015); see also Pinnacle Museum Tower, 55 Cal. 4th at 236 ("[T]he party opposing arbitration bears the burden of proving any defense, such as unconscionability.").

### 1. **Procedural Unconscionability**

Under California law, the "[p]rocedural unconscionability analysis focuses on oppression or surprise." Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1280 (9th Cir. 2006) (internal quotation marks omitted). "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice, while surprise involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." Id. (internal quotation marks omitted). Here, Shierkatz raises four arguments why the Delegation Provision is procedurally unconscionable.

#### a. **Temporal Scope of the Delegation Provision**

First, Shierkatz argues that the Square misled it as to the temporal scope of the Delegation

Provision. ECF No. 36 at 12–13. According to Shierkatz, "a web site that [Shierkatz] swears it read and relied upon before signing [the Square Seller Agreement] indisputably said there were 'no commitments' and 'no long term contracts.'" Id. at 12. Nonetheless, section 59 of the Square Seller Agreement provided that the Agreement covered any "Dispute" between Shierkatz and Square, including "any claims that . . . may arise after termination of this Agreement." ECF No. 15-2. Shierkatz argues that "burying [such] a contradictory provision at the end of the fine print is fraud in the inducement plain and simple," thereby rendering the Delegation Provision procedurally unconscionable. ECF No. 36 at 13.

Shierkatz's argument that it was fraudulently induced into signing the Square Seller Agreement is not plausible. Plaintiff, a bankruptcy law firm, is without question a sophisticated party. It is not plausible that a sophisticated party such as Shierkatz would rely on a statement made on Square's website that there were "no long term contracts" to mean that the Square Seller Agreement would not apply to post-termination claims, especially when the Square Seller Agreement clearly stated that "[i]f your Square Account is terminated or suspended for any reason or no reason, you agree . . . to continue to be bound by this Agreement." ECF No. 15-2, § 40. Moreover, the Square Seller Agreement included an integration clause, providing: "[e]xcept as expressly provided in this Agreement, these terms are a complete statement of the agreement between you and Square . . . ." Id. § 57. Even if the Court were to find that the statement on Square's website could fairly be read to relate to the arbitration provision *and* that the combination of these statements was somehow misleading – a result the Court is unlikely to reach – the Court would still find that this allegedly misleading practice does not support a finding of procedural unconscionability.

### b.  Misdirection regarding the parties bound by the Square Seller Agreement

Second, Shierkatz argues that the Square Seller Agreement was procedurally unconscionable because there was no reason for Shierkatz "to believe that when its agent pressed 'continue' that meant Square's *Seller* Agreement referred to its relationship with [Square because Shierkatz] was the *buyer* of [Square's] services." ECF No. 36 at 14. The Court agrees with Square that this argument is implausible, especially given the fact that the very first sentence of

11

the Square Seller Agreement clearly states: "This Seller Agreement . . . is a legal agreement between you . . . and Square . . . governing your use of Square's mobile and website applications . . . ." ECF No. 15-2.  That the argument is made on behalf of a law firm renders it even less plausible.

### c. Confusion as to the term "Dispute"

Third, Shierkatz contends that the Square Seller Agreement uses the terms "dispute" and "Dispute" in a confusing manner.  ECF No. 36 at 15–16.  According to Shierkatz, the term "dispute" is used throughout the Square Seller Agreement "to refer to financial disagreements that arise in the ultimate customer's use of the [Square] system." Id. at 16. "By the time one gets to Square's Arbitration Agreement ¶ 51 there is no reason at all for a customer to think that *Disputes* meant anything different that *disputes* just because its [sic] capitalized—especially since the immediately preceding ¶ 50 also refers to arbitrating *disputes*." Id.  However, "out-of-the-blue, in ¶ 59, [Square] retroactively changes the meaning of *Disputes* to include any and all manner of things from the beginning of the world until the end of time." Id.

This argument also is without plausibility.  Using a capitalized version of a word to mean something different than the uncapitalized version of that word, and clearly defining the capitalized version of the word in a "Definitions" section of an agreement, does not constitute hiding the agreed-upon term "in a prolix printed form drafted by the party seeking to enforce [it]," Nagrampa, 469 F.3d at 1280, especially where the party asserting unconscionability is sophisticated.

### d. Adhesion

Fourth, Shierkatz argues that the Delegation Provision is procedurally unconscionable because it is contained in a contract of adhesion.  ECF No. 36 at 17–18.  Shierkatz contends that the Square Seller Agreement is adhesive because it is a standardized contract which was presented to Shierkatz in a "take-it-or-leave-it" manner with no opportunity to negotiate.  Id.  Square does not dispute that the Square Seller Agreement was a contract of adhesion.  ECF No. 28 at 11. Instead, Square argues that form agreements, like the Square Seller Agreement, are found to be "procedurally unconscionable only if the party challenging the agreement can show it had no

choice but to contract with the enforcing party." Id. (citing Morris v. Redwood Empire Bancorp, 128 Cal. App. 4th 1305, 1320 (2005) for the proposition that an agreement is not procedurally unconscionable where a plaintiff "failed to allege he could not have obtained merchant credit card services from another source on different terms").

California courts "recognize that showing a contract is one of adhesion does not always establish procedural unconscionability." Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc., 232 Cal. App. 4th 1332, 1348 n.9 (2015); Nagrampa, 469 F.3d at 1281. To determine whether a contract of adhesion is procedurally unconscionable, California courts consider several factors, including: (1) the relative bargaining power and sophistication of the parties, (2) the complaining parties' access to reasonable market alternatives, and (3) the degree to which an offending provision of a contract is "buried in a lengthy . . . agreement." See, e.g., Roman v. Superior Court, 172 Cal. App. 4th 1462, 1471 & n.2 (2009) ("When bargaining power is not grossly unequal and reasonable alternatives exist, oppression typically inherent in adhesion contracts is minimal."). California courts also consider whether the agreement arose from a "situation[] where adhesion contracts are oppressive, despite the availability of alternatives," such as when "a sick patient seek[s] admittance to a hospital" or when an employee is presented with an employment contract. Morris, 128 Cal. App. 4th at 1320.

Applying these factors, the Court concludes that Shierkatz has shown a minimal degree of procedural unconscionability arising from the adhesive nature of the Square Seller Agreement. The fact that the Delegation Provision did not explicitly state that the arbitrator shall decide arbitrability, but instead did so by incorporating the AAA and JAMS rules, also supports a finding of procedural unconscionability.[7] However, three factors militate against a finding of procedural unconscionability. First, Shierkatz is a highly sophisticated party. Gatton v. T-Mobile USA, Inc., 152 Cal. App. 4th 571, 597 (2007) ("Where the plaintiff is highly sophisticated and the challenged

---

[7] In so finding, the Court does not conclude that the Arbitration Provision itself was "buried in a lengthy . . . agreement." Roman, 172 Cal. App. 4th at 1471. Indeed, the introductory paragraph of the Square Seller Agreement highlighted the presence of the Arbitration Provision, stating: "Part Two [of this Agreement] contains additional legal terms, including provisions that . . . require individual arbitration for any potential legal dispute." ECF No. 15-2.

provision does not undermine important public policies, a court might be justified in denying an unconscionability claim for lack of procedural unconscionability even where the provision is within a contract of adhesion."). Second, as in Morris, Plaintiff here has "failed to allege [it] could not have obtained [Square's] services from another source on different terms." [8] 128 Cal. App. 4th at 1320; see also Net Global Mktg., Inc. v. Dialtone, Inc., 217 F. App'x 598, 601 (9th Cir. 2007) (holding that plaintiff "has not met its burden on this issue, for it has not pointed to any evidence indicating that it was faced with an 'absence of reasonable market alternatives' in which an arbitration clause was not mandatory."); Wolf v. Langemeier, No. 09-cv-03086, 2010 WL 3341823, at *6 (E.D. Cal. Aug. 24, 2010) (finding that "Plaintiffs have failed to meet their burden of showing the arbitration agreements were oppressive" in part because "Plaintiffs have not shown they did not have 'many reasonable and realistic market alternatives.'"). Third, "unlike situations where the weaker party is under immediate pressure not to seek out alternative sources, [Shierkatz] was under no such compulsion" here. Id.

While the Court "acknowledges that the evidence of procedural unconscionability appears minimal, it is sufficient to require [the Court], under California law, to reach the second prong of the unconscionability analysis." Nagrampa, 469 F.3d at 1284. The Court therefore examines "the extent of substantive unconscionability to determine, whether based on the California courts' sliding scale approach, the arbitration provision is unconscionable." Id.

### 2. Substantive Unconscionability

"Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." Pinnacle Museum Tower, 55 Cal. 4th at 246. However, "[a] contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be so one-sided as to shock the conscience." Id. (internal quotation marks omitted).

Shierkatz makes three arguments why the Delegation Provision itself is substantively unconscionable. The Court concludes that Shierkatz's first two reasons provide no support for a

---

[8] Plaintiff does not contest this point. ECF No. 36 at 17–19.

1  finding of substantive unconscionability. While it is less clear whether Shierkatz's third reason
2  supports a finding of substantive unconscionability because the underlying state law is unsettled,
3  the Court concludes that this factor standing alone, even if credited, does not support the
4  conclusion that the Delegation Provision is "so one-sided as to shock the conscience." Id.

### a. Temporal Scope of the Delegation Provision

First, Shierkatz argues that "the infinite scope and duration" of the Delegation Provision is "so overly broad as to be substantively unconscionable given how unusual, harsh, oppressive, one-sided and unfair [it is] to [Shierkatz] and the putative Class." ECF No. 36 at 21. According to Shierkatz, "[n]o one who signed up for [Square's] services could or would have ever reasonably expected to have to continue to arbitrate with [Square] over even unrelated claims which might arise years after their relationship with [Square] had first ended." Id. at 21–22.

While the Delegation Provision does apply to "Disputes," which include "any claim . . . . between you and Square . . . relating in any way to this Agreement[,] include[ing] any claims . . . that may arise after termination of this Agreement," ECF No. 15-2, § 59, Shierkatz cites no authority supporting its claim that such a provision renders the Delegation Provision substantively unconscionable. ECF No. 36 at 20–22. Moreover, Square persuasively argues that there is nothing unconscionable about an arbitration provision that applies to claims that relate to a particular agreement, but that nonetheless arise after the termination of the operative agreement. ECF No. 28 at 18 (citing Balandran v. Labor Ready, Inc., 124 Cal. App. 4th 1522, 1530 (2004) ("We agree that an employment application can contain an arbitration clause regarding disputes arising out of the subsequent employment.").[9] Accordingly, the Court concludes that the temporal scope of the Delegation Provision provides no support for a finding of substantive unconscionability.

### b. Iskanian

Second, Shierkatz argues that the Delegation Provision is substantively unconscionable

---

[9] Indeed, here, Plaintiff's alleged "Post-Termination" claim arises out of an email sent to Plaintiff by Square on April 16, 2015, the same day that Square allegedly terminated Plaintiff's account. ECF No. 55 ¶ 7.

15

because it "represent[s] an attempt to strip persons of the right to initiate enforcement procedures on behalf of the State of California." ECF No. 36 at 25.  Shierkatz relies primarily on the California Supreme Court's decision in Iskanian v. CLS transportation Los Angeles, LLC, which held that where "an employment agreement compels the waiver of representative claims under the [Private Attorneys General Act ('PAGA')], it is contrary to public policy and unenforceable as a matter of state law." 59 Cal. 4th 348, 384 (2014).  Square responds that the California Supreme Court's ruling in that case has no effect here because "Iskanian concerned claims brought pursuant to the Public Attorneys General Act, . . .which authorizes private litigants to seek fines on behalf of the government for labor code violations." ECF No. 40 at 9.  By contrast, "this case does not involve a PAGA claim, and there is no comparable provision in the Unruh Act authorizing individuals to seek fines on behalf of the state." Id.

Shierkatz cites no authority suggesting that the California Supreme Court's reasoning in Iskanian should be extended to embrace claims arising under the Unruh Act.  More fundamentally, however, the Court need not address Shierkatz's argument premised on the Iskanian decision because such an argument is directed at the Arbitration Provision as a whole and is not "specific to the delegation provision" itself. Brennan, 796 F.3d at 1133 (quoting Rent-A-Center, 561 U.S. at 74).  Accordingly, such an argument "is for the arbitrator to decide in light of the parties' 'clear and unmistakable' delegation of that question," as the Court held above. Id.

### c. Illusory Nature of the Delegation Provision

Third, Shierkatz argues that the Delegation Provision is substantively unconscionable because it is "illusory as to Post-Termination Unruh Law Violations." ECF No. 36 at 22. Shierkatz contends that section 54 of the Square Seller Agreement gives Square "the unbridled discretion to amend that agreement at will." Id. at 24.  Square thus "retained the right to decide for itself whether it personally wanted to arbitrate with" Shierkatz, rendering the Delegation Provision an "illusory promise." Id.

In support, Shierkatz quotes a California Court of Appeals case, Sparks v. Vista Del Mar

1  Child & Family Services,[10] for the proposition that "[a]n agreement to arbitrate is illusory if . . .
2  the employer can unilaterally modify [it]." 207 Cal. App. 4th 1511, 1523 (2012). Shierkatz also
3  cites to a recent Northern District of California decision, Mohamed v. Uber, which considered
4  whether a unilateral modification provision "that permit[ted] Uber to unilaterally modify the terms
5  of the contract without notice to drivers" was substantively unconscionable. 2015 WL 3749716 at
6  *30. "In the absence of controlling authority on this issue from the California Supreme Court,"
7  Judge Chen attempted to predict how the California Supreme Court would decide the issue. Id.
8  (internal quotation marks omitted). Judge Chen determined that "the intermediate appellate court
9  decisions in California go both ways. However, the Ninth Circuit–which was likewise obligated
10 to 'predict' the California Supreme Court's ruling on this issue–has definitively held that a
11 unilateral modification provision is substantively unconscionable under California law." Id.
12 (citing Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1179 (9th Cir. 2003)). As a result, Judge
13 Chen predicted that the California Supreme Court would "hold that a unilateral modification
14 provision is substantively unconscionable under these circumstances." Id.

15 The Court agrees with Judge Chen that there is no controlling authority on this issue from
16 the California Supreme Court and that "the intermediate appellate court decisions in California go
17 both ways." Id. While the Court does not disagree with Judge Chen's conclusion that the
18 California Supreme Court would likely "hold that a unilateral modification provision is
19 substantively unconscionable," id., the Court need not reach this issue here because none of the
20 authorities cited by Shierkatz support the proposition that a unilateral modification provision can
21 render a delegation provision substantively unconscionable *by itself*.

---

[10] The precedential value of this statement in Sparks is questionable given that a subsequent California Court of Appeal decision characterized the statement as "dictum," and declined to follow it because the statement was (1) supported by only out-of-state authority, (2) involved no further legal analysis, (3) and failed to discuss a prior California Court of Appeal case, 24 Hour Fitness, Inc. v. Superior Court, 66 Cal. App. 4th 1199 (1998), which held otherwise. Serpa v. California Surety Investigations, Inc., 215 Cal. App. 4th 695, 708 n.7 (2013) (holding that "the implied covenant of good faith and fair dealing limits the employer's authority to unilaterally modify the arbitration agreement and saves that agreement from being illusory and thus unconscionable."). 24 Hour Fitness held that because the "discretionary power to modify the terms of [a contract] in writing indisputably carries with it the duty to exercise that right fairly and in good faith," a unilateral modification provision "does not render the contract illusory." 66 Cal. App. 4th at 1214.

1    Rather, in Mohamed v. Uber, Judge Chen identified "four substantively unconscionable
2    terms that affect[ed] the arbitration provision . . . *in addition* to the unconscionable PAGA
3    waiver." Id. at *31 (emphasis in original). Judge Chen went on to find that "[w]hile standing
4    alone, none of these four additionally unconscionable clauses would necessitate a conclusion that
5    the 2013 arbitration provision is 'permeated with unconscionability,' taken together such a
6    conclusion is required." Id. In making this determination, Judge Chen principally relied on
7    "substantively unconscionable clauses regarding arbitration fees and arbitration confidentiality
8    [and] an unconscionable term exempting Uber's most favored claims from arbitration while
9    forcing drivers to arbitrate those claims that they are most likely to bring." Id. Judge Chen
10   characterized the unilateral modification provision as "at least . . . moderately unconscionable."
11   Id.

12   By contrast, here, the only provision related to the Delegation Provision which might
13   provide some support for Shierkatz's claim is the unilateral modification provision. The unilateral
14   modification provision here is even less offensive than the one in Mohamed v. Uber because
15   unlike the provision in that case, Square's unilateral modification provision requires notice, albeit
16   "notice that [Square in its] sole discretion deem[s] to be reasonable in the circumstances."[11]
17   Absent any authority finding that a unilateral modification provision is alone sufficient to find a
18   contract substantively unconscionable, the Court declines to hold that the terms of the Square
19   Seller Agreement, as they relate to the Delegation Provision specifically, are "so one-sided as to
20   shock the conscience." Pinnacle Museum Tower, 55 Cal. 4th at 246.

21   Accordingly, the Court concludes that the Delegation Provision is not substantively
22   unconscionable. Combined with the Court's prior holding that the Delegation Provision was, at
23   most, minimally procedurally unconscionable, the Court finds that under the California court's
24   sliding-scale analysis, the Delegation Provision is not unconscionable and should therefore be

---

[11] Moreover, the unilateral modification provision here provides that "[a]ny use of the Services after our publication of any such changes shall constitute your acceptance of this Agreement as modified. However, any Dispute that arose before the modification shall be governed by the Agreement (including the binding individual arbitration clause) that was in place when the Dispute arose." ECF No. 15-2, § 52.

enforced.

## CONCLUSION

For the foregoing reasons, the Court concludes that the parties clearly and unmistakably agreed to arbitrate the threshold issue of arbitrability. Brennan, 796 F.3d at 1130. The Court further declines to find that the Delegation Provision within the Square Seller Agreement is unconscionable as a matter of California contract law, at least as it pertains to these parties.[12] Accordingly, the Court grants Square's motion to compel arbitration and will stay further proceedings in this case.

The parties are instructed to submit status reports to the Court within ninety days of the date this order is electronically filed, and additional joint status reports every ninety days thereafter, apprising the Court of the status of the arbitration proceedings. Within fourteen days of the completion of the arbitration proceedings, the parties shall jointly submit to the Court, a report advising the Court of the outcome of the arbitration, and a request that the case be dismissed or that the case be reopened and a case management conference be scheduled.

IT IS SO ORDERED.

Dated: December 17, 2015

_____
JON S. TIGAR
United States District Judge

---

[12] Compare Meadows v. Dickey's Barbecue Restaurants Inc., No. 15-CV-02139-JST, 2015 WL 7015396, at *7 (N.D. Cal. Nov. 12, 2015) (declining to apply the rule in Brennan to unsophisticated parties).